**Andrew V. Wright (11071)**
  *andy.wright@dentons.com*
**Mark R. Nelson (13562)**
  *mark.r.nelson@dentons.com*
**DENTONS DURHAM JONES PINEGAR, P.C.**
3301 N Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600

**Benjamin J. Lewis (*pro hac vice pending*)**
  *ben.lewis@dentons.com*
**DENTONS BINGHAM GREENEBAUM LLP**
3500 PNC Tower
101 S. Fifth Street
Louisville, KY 40202
Telephone: (502) 589-4200

*Attorneys for Plaintiff Newpath Mutual Insurance Co.*

---

### UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NEWPATH MUTUAL INSURANCE CO., <br><br> Plaintiff, <br><br> vs. <br><br> JESSICA HIGGINS, ROBYN LYNN SZTYNDOR, JARROD WILSON, M.D., CURATED FUND OF FUNDS, LP, CURATED FINANCIAL, INC., MAGELLAN ADMINISTRATION CO., <br><br> Defendants. | **COMPLAINT** <br><br> (JURY DEMANDED) <br><br> Case No: 2:22cv00709 TC <br><br> Judge Tena Campbell |

Plaintiff Newpath Mutual Insurance Co. ("Newpath"), by counsel and for its Complaint, states as follows:

**INTRODUCTION**

1.      This is an action to address and rectify the individual Defendants' improper attempt to wrest control of Newpath from its rightful Board of Directors, and to recover money that the individual Defendants, along with Curated Fund of Funds, LP and Curated Financial, Inc., misappropriated from Newpath under false pretenses.

2.      Newpath also seeks a declaratory judgment that it does not owe any further contractual or other duties to Magellan Administration Co., under an "Administrative Services Agreement."

**PARTIES**

3.      Plaintiff Newpath is a corporation organized under the laws of Utah.  Newpath is an approved captive insurance company regulated by the Utah Insurance Department, in accordance with the Utah Captive Insurance Companies Act.  See Utah Code. § 31A-37-101, *et seq*.  Insurance is a highly regulated industry.  This includes captive insurance companies, which generally insure the risks of their owner(s) and/or affiliates.  Newpath is subject to the general insurance statutes in Utah, as well as the Utah Captive Insurance Companies Act, and regulations promulgated thereunder.  Thus, in addition to its Board of Directors, and as is custom for a captive insurance company, Newpath is managed by a captive management firm approved by the Utah Insurance Department, that being Valley National Administrative Services, LLC ("VNAS") located in Covington, Kentucky.[1]  See Utah Admin. Code R590-238-3(4).

---

[1]      Captives – even those owned by Fortune 500 companies -  almost always hire a "captive manager", to assure that the insurance laws and regulations are complied with, the reports are timely filed, that the financial audits and tax returns are filed, etc.  A captive manager must

4.      Defendant Jessica Higgins ("Higgins") is, upon information and belief, a resident of Florida, although she claims to "liv[e] between Miami, FL, San Diego, CA and Charleston, SC."  According to one of her personal websites, Higgins:

> …is a serial entrepreneur, investor, advisor and award-winning marketing expert who has helped develop radical organizational growth, including seven of the Fortune 100 companies. She is a recognized thought leader by Forbes, Entrepreneur, NBC News, Mashable, Thrive Global, Buzzfeed and thousands of other publications, and was named a Breakthrough Female Founder by The Huffington Post. Her first book, The 10 Essential Business Communications Skills, released at #1 in Amazon New Releases for Communication. Her research, publications and speaking engagements focus on helping business professionals, and everyday people, understand emerging trends and their cultural implications. She lives between Miami, FL, San Diego, CA and Charleston, SC.

See Higgins Internet Biography Page, attached as Exhibit 1.

According to her "Blog" page:

> Jessica Higgins, JD MBA is a highly credentialed and experienced business growth consultant.  She gets involved in unique opportunities at the crossroads of finance, technology, and marketing to create innovative growth.  She holds investment and advisory positions in a portfolio of companies and is a published author who writes about her business and personal passions.  Her first book, The 10 Essential Business Communications Skills, released at #1 on Amazon New Releases for communication and behavior skills.  She has given keynote speeches on topics ranging from culture to emergent technologies.  In addition to her graduate degrees in law and business, and her undergraduate degrees in behavioral psychology and political science, she holds certifications in operations management, operations design and behavioral design.

See https://www.jessicahiggins.co/blog.

---

be approved by the Utah Insurance Department.  From inception, Valley National Insurance Services, LLC has been Newpath's captive manager, and has been an approved captive manager that entire time.

3

Through her Internet postings on Instagram, Facebook Twitter, Pinterest, LinkedIn,

Higgins purports to be an "Influencer," and has written articles on the subject including "How

Anyone Can Be an Influencer," where she held herself out as:

> an agent of change for public, private and non-profit organizations around the world. Her focus is on facilitating the development of an enterprise's authentic voice as a means of conveying their core values to stakeholders through their internal and external words and actions.
>
> Beyond her advisory work, Ms. Higgins is a best-selling author as her first book: 10 Skills For Business Communication, reached #1 in Amazon.com New Releases for Communication and Social Skills books. Her work has also been published in over ten thousand media outlets including Forbes, Entrepreneur, Thrive Global, Huffington Post, CBS, and Newsweek.
>
> In addition to serving as a Partner of R+I, Ms. Higgins is the President of Curated Financial, an investment fund manager she founded in order to streamline the cultivation of bespoke investment opportunities for private clients after finding a general lack of cohesion in the investment selection process of alternative investment options. Curated Financial advises a venture capital fund and a fund of funds focused on the selection of emerging managers.
>
> Ms. Higgins holds a Bachelor of Arts in Political Science and Behavioral Psychology from the University of Texas at Austin and a Juris Doctorate / Master of Business Administration from the University of Miami. In addition, Ms. Higgins is a Lean Six Sigma Black Belt Certification holder with specialty in Systems Design and holds an executive education certificate in Behavior Design from the Design Lab at Stanford University.

See https://www.jessicahiggins.co/blog/anyone-can-become-a-social-media-influencer-with-jessica-higgins.

5.      Defendant Robyn Lynn Sztyndor ("Sztyndor") is a Florida resident.  She holds a

license to practice law in Florida, although she was recently the subject of four (4) Florida Bar

disciplinary matters.  In response thereto, she pled guilty to the violation of numerous Rules of

Professional Conduct, and agreed to the entry of a Consent Judgment to that effect.  See The

Florida Bar v. Robyn Lynn Sztyndor, November 3, 2021 Report of Referee Accepting Consent

Judgment, attached as Exhibit 2.  As a result, she was publicly reprimanded by the Florida Supreme Court on November 24, 2021, and is in the midst of a two year probationary period associated with her guilty plea.  See id., November 24, 2021 Order, attached as Exhibit 3.

Sztyndor holds herself out as the "Managing Partner" of the Fort Lauderdale office of a law firm named Physicians Law, P.A.  Although her firm does not maintain a website, Sztyndor maintains a personal website which describes her role with the firm, and includes a "Portfolio" of her work.  See Exhibit 4.

Sztyndor now claims to serve on the Board of Directors for Newpath, despite the fact that she was never properly elected or appointed thereto.  Sztyndor has sent Newpath and its duly elected officers, directors, captive manager (VNAS), and legal counsel a litany of demanding and threatening emails.

As reflected in their extensive social media postings, Higgins and Sztyndor were law school classmates at the University of Miami, and remain close personal friends.  See e.g., Exhibit 5.

6.      Defendant Jarrod Wilson, M.D. ("Wilson") is a resident of Florida.  He has been a licensed medical doctor since September 7, 2017.  His medical practice is affiliated with a business in Florida known as The Remedy IV Health + Wellness.  His business "is not limited by insurance restrictions or requirements" because it does not "accept" insurance as a form of payment.  See Exhibit 6.

Wilson purports to be a director of Newpath.  He was never validly elected or appointed to that position.

7.      Defendant Curated Fund of Funds, LP ("Curated Funds") is a Delaware limited partnership that, upon information and belief, is owned and controlled by Higgins, and operated out of Florida.  Higgins describes Curated Funds as follows:

> Curated Fund of Funds, LP is an alternative asset manager that seeks to generate attractive, absolute returns by opportunistically and tactically investing in areas where conventional sources of capital are disproportionately unavailable. Curated Investments was formed to expand the spectrum of opportunities for investors seeking risk adjusted returns that are less correlated to other markets. Specifically, the firm seeks to exploit inefficiencies that are borne from transactions requiring significant amounts of intellectual as well as financial capital. The firm is headquartered in Miami, Florida.

See Exhibit 7.

Despite being denominated as a "fund of funds," Curated Funds does not appear to have made any disclosures to the Securities and Exchange Commission pursuant to Rule 12d1-4 promulgated under the Investment Company Act of 1940.  See also https://www.sec.gov/investment/secg-fund-of-funds#_Toc54252154.

Either way, Curated Funds improperly received substantial sums from bank accounts belonging to Newpath, due to the improper conduct of Higgins.

8.      Defendant Curated Financial, Inc. ("Curated Financial") is a Delaware corporation that, upon information and belief, is owned and controlled by Higgins and operated out of Florida.  It is an affiliate of Curated Funds and improperly received substantial sums from bank accounts belonging to Newpath, due to the improper conduct of Higgins.

9.      Defendant Magellan Administration Co. ("Magellan") is a corporation organized under Delaware law.  Its principal place of business was located in South Carolina, at least up through the suicide of its principal, Alexander Chatfield Burns ("Decedent Burns"), on October 26, 2021.  The Estate of Decedent Burns (the "Burns Estate") is being administered by Seth W.

Whitaker, Esq., as court appointed "Special Administrator" in a probate proceeding pending in

the Charleston County (South Carolina) Probate Court.  The Special Administrator has made

clear that the Burns Estate ultimately controls a ninety percent (90%) majority stake in

Magellan.  See Report of the Special Administrator at p. 10, attached as Exhibit 8.

Upon information and belief, Magellan does not currently have any employees or

officers, and is not capable of directly providing any services to Newpath under the

Administrative Services Agreement.

## JURISDICTION, VENUE AND CASE ASSIGNMENT

10.     There is complete diversity of citizenship between Plaintiffs and the Defendants, the

amount in controversy exceeds $75,000 and, therefore, this Court has original jurisdiction pursuant to

U.S.C. § 1332(a)(1).  Indeed, Newpath is a Utah corporation, is domiciled in Utah, with its principal

place of business in Utah and its captive manager (VNAS) located in Kentucky.  None of the

Defendants reside in or maintain a principal place of business in Utah or Kentucky.

11.     This Court has personal jurisdiction over Defendant Higgins because she claims

to control certain assets and business pursuits of Newpath, which is located in Utah.  Those

claims are the subject of declaratory relief sought herein.  Further, this Court has personal

jurisdiction over Defendant Higgins because she converted and otherwise misappropriated funds

belonging to Newpath, thereby causing damage to Newpath in Utah.

12.     The Court has personal jurisdiction over Defendants Sztyndor and Wilson,

because they claim to serve on the Board of Directors for Newpath, a captive insurance

company organized under Utah law and regulated by the Utah Insurance Department.

13.     This Court has jurisdiction over Defendants Curated Funds and Curated Financial because they converted and/or otherwise misappropriated over $134,000 from Newpath, thereby causing damage to Newpath in Utah.

14.     This Court has jurisdiction over Defendant Magellan, because it claims to have a contract with Newpath in Utah, to be performed in Utah, which contract is the subject of declaratory relief sought herein.

15.     Venue is proper under 28 U.S.C. § 1391, as the instant claims arise, in large measure, from: (i) Defendants' breaches of agreements with Newpath which is located and regulated in Utah; (ii) certain Defendants' misappropriation of funds belonging to Newpath, thereby causing harm to Newpath in this District; and (iii) breaches (by the individual Defendants) of fiduciary obligations they claim to owe to Newpath in this District.

<u>**RELEVANT FACTS**</u>

**Formation, Capitalization and Governance of Newpath**

16.     Upon submission of an application to form an association captive, the Utah Insurance Department issued a "Certificate of Public Good" to Newpath's establishers on February 12, 2021, based on: (i) the character, reputation, financial standing, and purposes of the establishers; and (ii) the character, reputation, financial responsibility, insurance experience, and business qualifications of the principal officers or members of the governing body.  See Utah Code § 31A-37-301(4); see also Certificate of Public Good, attached as Exhibit 9.

17.     Next, Newpath was created on February 12, 2021 as a "Mutual Insurance Company in accordance with the laws of Utah."  See Articles of Incorporation at Article Two, attached as Exhibit 10.

18.     On March 22, 2021, after satisfaction of terms contained in the Certificate of Public Good, the Utah Insurance Department issued a Certificate of Authority for Newpath to operate as a captive insurance company domiciled in Utah.  See Certificate of Authority, attached as Exhibit 11.

19.     By design, "[t]he membership of the Corporation … consist[s] of all persons or entities holding contracts of insurance issued by the Corporation and who comply with the membership provisions of the bylaws of the corporation."  See Exh. 10 at Article Seven.

20.     From its inception, VNAS was the "initial registered agent and office of the Company."  See id. at Article Three.  VNAS has also served as Newpath's captive management firm at all times relevant, and ever since VNAS was identified as such in Newpath's opening application approved by the Utah Insurance Department.

21.     Ross Elliott, a citizen of the State of Utah, was the incorporator and establisher of Newpath, as required under Utah Code § 31A-37-301(3).  See id. at Article Four.  Mr. Elliott is the former Director of the Captive Division of the Utah Insurance Department.

22.     Throughout Newpath's existence, Mr. Elliott has served as a resident director of Newpath, as required by Utah Code § 31A-37-301(5)(a).  He also serves as the resident director of dozens of other captive insurance companies organized and operated under Utah law.

23.     In addition to Mr. Elliott, Kristof Wild, Robert Goodloe and C. Clay Olson were elected in 2021 to serve as "Class B" directors for the corporation and, in turn, were also approved to serve in that capacity by the Captive Division of the Utah Insurance Department. See Action of the Board of Directors, attached as Exhibit 12.

24.     The initial Board of Directors for Newpath, in turn, elected Kristof Wild as President, Robert Goodloe as Treasurer, and C. Clay Olson as Secretary for the corporation beginning in February 2021.  See id. at ¶ 4.

25.     The President of Newpath was also authorized, beginning in February 2021, to open bank accounts for the corporation.  See id. at ¶ 6.

26.     Newpath was initially capitalized with a $1,000,000.00 loan from Redirect Health, LLC, an entity based in Scottsdale, Arizona.  See Surplus Note, attached as Exhibit 13.

27.     Newpath is further governed by Bylaws, attached as Exhibit 14.  The Bylaws designate Mr. Elliott as the sole "Class A" director, along with at least three "Class B" directors, each of whom shall "also be members of the Board of Directors of the Modern Business Council, Inc."  See id. at Article 3.1.

28.     Modern Business Council, Inc. is designated in the Bylaws as the "Sponsor" of Newpath.  Id. at Art. 10.1.

29.     Vacancies on the Board of Directors for Newpath "may be filled at a regular or special meeting of the members" and, failing that, "by vote of the remainder of the board of directors."  Id. at Art. 3.6.

30.     The Board of Directors for Newpath, in turn, is authorized to act "without a meeting on written consent, if all directors consent to taking such action without a meeting. … The written consent shall set forth the action taken and shall be signed by each director, indicating each director's vote or abstention on the action."  Id. at Art. 3.5.

**The Life and Death of Alexander Chatfield Burns**

31.     Decedent Burns was "a former insurance industry wunderkind" who, in his early

20s, "gained control of several insurance companies started in 2013, then allegedly began

diverting the insurers' assets." <u>See</u> Exhibit 15, "Finance & Markets: SEC Charges Financier

with Fraud," The Wall Street Journal, Oct. 18, 2018.  According to The Wall Street Journal,

Burns' "scheme collapsed in early 2014, when Mr. Burns checked into a mental-health ward at

New York's Bellevue Hospital, leaving behind an affidavit describing an unusual set of asset

transfers."  <u>Id</u>.

32.     Decedent Burns has been described as "a dashing figure in young New York

financial circles," a "financial prodigy" "gifted with numbers and at structuring complex

transactions" who also "apparently [was] convincing and good at snookering regulators" that he

had a legitimate insurance business.  <u>See</u> Exhibit 16, "Investigators Sift Rubble Of Fallen

Financier's Empire --- Insurance regulators try to untangle young star's dubious deals as losses

approach $250 million," The Wall Street Journal, Mar. 21, 2015.

33.     The United States Securities and Exchange Commission ("SEC") filed a civil

complaint against Burns in October 2018, in response to which he quickly agreed to a judgment

requiring him to pay disgorgement of "ill-gotten gains," interest, and civil penalties, in an

amount to be determined by the United States District Court for the Southern District of New

York on motion of the SEC.  <u>Securities and Exchange Commission v. Burns</u>, Case No. 1:18-cv-

9477-LGS (S.D.N.Y.).[2]  The complaint in that case, which is attached as Exhibit 17, outlines an array of fraudulent insurance schemes by Burns.

34.     Decedent Burns ultimately settled with the SEC, agreeing to be barred from the securities industry.

35.     In the wake of the fallout from the SEC charges and settlement, Decedent Burns worked to rebuild his life.  In one aspect of that rebuilding effort, Decedent Burns initiated a series of meetings, proposals and introductions that brought together several of the individuals and businesses that ultimately formed Newpath, and other entities which maintain fruitful business relationships with Newpath.

36.     Decedent Burns did not form, have any ownership interest in, or control Newpath.

37.     Decedent Burns never served as an officer, director, or employee of Newpath.

38.     Decedent Burns had no formal role in any aspect of the formation, capitalization, or operation of Newpath.

39.     According to Higgins, Decedent Burns proposed an "Administrative Services Agreement" with an entity known as Magellan, to the initial board of directors for Newpath, in early 2020 or early 2021.  Decedent Burns apparently controlled Magellan during his lifetime, albeit through a series of trusts and parent companies.

40.     Decedent Burns committed suicide on October 26, 2021.

---

[2] The United States also initiated a related federal criminal action by a sealed information filed November 11, 2018 in the United States District Court for the Southern District of New York against Mr. Burns. As a result of Mr. Burns's untimely death, the court entered an order of nolle prosequi on December 16, 2021.

41.     Although he was married to another woman, at the time of his death Decedent Burns was living with Higgins in a one bedroom apartment in Charleston, South Carolina.

42.     Upon information and belief, earlier in the day before his death, Higgins was with Decedent Burns in the apartment they shared.

43.     On the day of Burns's suicide, Carol Shershenovich, General Counsel of Redirect Health, received an email from "alex@researchinnovation.co" stating:

*Carol-*

*I hope all is well, given the work with the transfer agents, I want to make sure you have the correct contact information for York Holdings, LLC (Wyoming LLC), which owns 200,000 shares of RDH.*

*York Holdings, LLC*
*c/o Jessica Higgins*
*2001 Meridian Ave, Apt 326*
*Jessica@cultured-group.com*
*(858) 209-4188*

*York Holdings EIN is 85-1509030 and it is a US taxpayer (not subject to backup withholding).*

*Jessica is authorized to manage York's portfolio as she executed the purchase of RDH interests in connection with the sale of 10% of Magellan, which remains 90% owned by York.*

*Best regards,*
*Alex*

44.     According to the Special Administrator of his Estate, Decedent Burns:

*"was a former Wall Street financier who was in significant legal trouble with the Securities and Exchange Commission and left a trail of litigation in his wake. He apparently had a sophisticated knowledge of finance, business, and trust structures. As a result, his assets are among the most complex webs I have ever seen in eighteen years of law practice, touching on the trust, corporation, LLC, and creditor laws of multiple jurisdictions.*
*In his suicide note, Mr. Burns stated simply that his 'assets and liabilities are too complex to convey.' ... Mr. Burns also stated that he was intestate and had*

13

*revoked all prior wills; [the Special Administrator has] found no evidence to the contrary regarding his intestacy."*

<u>See</u> Report of Special Administrator, Exh. 8, at pp. 1-2.

45.    According to Higgins: (a) Magellan has a valid contract with Newpath; (b) she inherited or otherwise secured control of Magellan upon the death of Decedent Burns; and (c) She is now entitled to the fruits of the alleged contract between Magellan and Newpath.

**The South Carolina Probate Proceedings**

46.    A probate proceeding was initiated for the Burns Estate on December 10, 2021.

47.    On January 12, 2022, the Charleston County Probate Court appointed the Special Administrator to administer the Burns Estate.

48.    Shortly thereafter, the Special Administrator had a telephone conversation with Higgins.  During the conversation, Higgins: (i) denied any involvement with several business entities associated with Decedent Burns; (ii) claimed the Burns Estate had little property; and (iii) encouraged the Special Administrator not to search for or investigate estate assets.  <u>See</u> February 14, 2022 Correspondence of Special Administrator at p. 2, attached as Exhibit 18.

49.    On January 14, 2022, the Special Administrator and Higgins exchanged emails with a domain name operator, concerning control of domain names believed to be part of the Burns Estate.  In the course of those emails, Higgins directed the third party domain name operator to:  "*Please disregard the stupid claims of a personal attorney who has taken claim over a dead person with no assets.  We will be reaching out shortly with proper legal docs to turn over these assets to their proper owners.*"  <u>See</u> Exhibit 18 at January 14, 2022 Email of Jessica Higgins.

14

50.     On January 17, 2022, the Special Administrator wrote to Higgins to request that she provide information regarding her dealings with Decedent Burns and his property, and directed that Higgins preserve documents concerning the Burns Estate and a number of companies associated with Burns during his lifetime; including the parent entity of Magellan: Continuum Fiduciary Management, LLC.  See Exhibit 19, January 17, 2022 Correspondence to Higgins.

51.     Later, and according to the Special Administrator, Higgins sent him documents that were apparently forged, in an effort to obtain control over assets of the Burns Estate.

52.     When the Special Administrator confronted Higgins about the apparent forgery, she accused him of theft and fraud, threatened litigation, and filed a Bar Complaint against him.

53.     On January 21, 2022, the Special Administrator executed Resolutions to specifically remove Higgins from any and all positions she claimed to hold in respect of Magellan's parent entities: Continuum Fiduciary Management, LLC and York Holdings, LLC. See Resolutions, attached as Exhibit 20.

54.     On February 10, 2022, Higgins directed Defendant Sztyndor to send a "Cease and Desist" letter to the Special Administrator, claiming that he had acted outside of his authority in exercising control over certain business assets previously affiliated with Decedent Burns.  See Correspondence from Sztyndor, attached as Exhibit 21.

55.     The Special Administrator promptly responded to Higgins's Complaint to the South Carolina Office of Disciplinary Counsel on February 14, 2022, which resulted in the summary dismissal of her complaint.  See Exhibit 18.

15

56.     On March 21, 2022, the Special Administrator filed a comprehensive report with the Probate Court overseeing the Burns Estate, which includes details as to his actions to secure control over the parent entities for Magellan.  See Exh. 8, Report, at pp. 6, 8-9.

57.     Throughout the administration of the Burns Estate, Higgins has known that Magellan was owned and controlled by York Holdings, LLC, which is in turn owned and controlled by Continuum Fiduciary Management, LLC, both of which were claimed as assets of the Burns Estate by the Special Administrator.  See Equity Contribution Agreement, attached as Exhibit 22 (signed by Higgins on Jan. 1, 2021, and recognizing Magellan ownership structure).

58.     Higgins has never challenged the conduct of the Special Administrator in any legal proceeding.

59.     The time period for creditors and others to assert claims against the Burns Estate closed on October 26, 2022.

60.     Higgins did not timely file any claims against the Burns Estate.

61.     Higgins did not timely file any claim that she owned or controlled any of the assets that the Special Administrator included in his inventory and Report filed on March 21, 2022.

**Higgins Claims To Have Inherited Magellan, Takes Money from Newpath, and Puts the Entity in Jeopardy**

62.     In early 2022, Higgins approached the President of Newpath, Kristof Wild, and represented to him that she had effectively inherited ownership and control of Magellan from the Burns Estate.  A negotiation occurred wherein Higgins asked President Wild to sign an "Amendment to Administrative Services Agreement" dated as of January 1, 2022, which purported to amend the Administrative Services Agreement "initially dated the 30th day of

16

September 2020."  See Amendment, attached as Exhibit 23.  To induce Newpath to sign the

amendment, Higgins agreed to reduce the monthly fee from 8.75% to 5% per month, based on

premium payments received by Newpath.

63.     Induced by Higgins's misrepresentations, and believing there was a valid

administrative arrangement between Magellan and Newpath, President Wild signed the

Amendment.

64.     Thereafter, Higgins sent numerous emails and other correspondence purporting to

act on behalf of Newpath, even to the point of filing inaccurate tax returns, asserting control

over Newpath bank account(s), ignoring and attempting to circumvent the approved captive

management firm (VNAS), purporting to appoint new directors to the board, and unilaterally

attempting to retain new legal counsel and auditing services for Newpath.  At no point did

Higgins properly disclose such conduct to the full Board of Directors, much less receive

approval therefore.  Nor did Higgins disclose and receive approval for this conduct from the

Utah Insurance Department, through VNAS or otherwise.

65.     Through her misrepresentations and surrounding misconduct, Higgins also

obtained confidential documents and other information she should not have received –

concerning Newpath and its insureds.

66.     Subsequent investigation has not revealed any prior written Administrative

Services Agreement reviewed, approved or ratified by the Newpath Board of Directors after

Newpath was formed in February 2021.

67.    The version which Higgins relies upon is dated September 30, 2020, and contains a number of duties owed to Newpath which: (i) overlap[3] with the duties and obligations of the approved captive management firm for Newpath (*i.e.*, VNAS); and (ii) simply are not being performed by Magellan.  See Administrative Services Agreement, attached as Exhibit 24.

68.    Between March 11 and September 6, 2022, Higgins has caused Newpath to direct over $144,400 to her affiliated business, Curated Financial and/or Curated Funds, under the guise that such payments were in satisfaction of amounts owed to Magellen under the Administrative Services Agreement.  Below is a ledger of those transactions:

| Date | Payee | Description | Amount |
|---|---|---|---|
| 3/11/2022 | Curated Financial | WT Seq189409 Curated Financial/BNF=Curated Financial | (61,032.50) |
| 3/18/2022 | Curated Financial | WT Seq132363 Curated Financial/BNF=Curated Financial | (21,750.23) |
| 4/4/2022 | Curated Financial | WT Seq392100 Curated Financial/BNF=Curated Financial | (5,000.00) |
| 4/28/2022 | Curated Financial | WT Seq177159 Curated Financial/BNF=Curated Financial | (7,577.15) |
| 5/31/2022 | Curated Financial | WT Seq61464 Curated Financial/BNF=Curated Financial | (7,946.42) |
| 6/28/2022 | Curated Financial | WT Seq12765 Curated Financial/BNF=Curated Financial | (8,123.25) |
| 7/28/2022 | Curated Financial | WT Seq39519 Curated Financial/BNF=Curated Financial | (8,000.00) |
| 8/1/2022 | Curated Financial | WT Seq149217 Curated Financial/BNF=Curated Financial | (2,975.11) |
| 9/6/2022 | Curated Financial | WT Seq#43304 Curated Financial/BNF=Curated Financial | (12,000.00) |
| 10/3/2022 | Curated Financial | WT Seq#43304 Curated Financial/BNF=Curated Financial | (10,000.00) |
| | **Curated Financial Total** | | **(144,404.66)** |

69.    In April 2022, after Higgins claimed to control Magellan, VNAS tested that claim by requesting certain financial documents from Higgins which were important to the extension of Newpath's tax return filing deadline, and the ultimate preparation of Newpath's tax returns. In response, Higgins did not provide any of the requested documents and represented that she had already caused a tax return to be filed on behalf of Newpath.  After multiple additional requests, Higgins provided VNAS with a Form 1120 that she had unilaterally filed on behalf of Newpath; even though captive insurance companies such as Newpath are required to file a Form 1120-PC.  The Form 1120 she filed for Newpath reflected a substantial loss, when in fact the

---

[3] Compare Utah Admin. Code r. R590-238-3 (specifying the duties of a captive management firm), with Exhibit 24.

captive insurance company had taxable income.  Making matters worse, Higgins further misrepresented to VNAS that the Board of Directors had approved the improper and inaccurate tax return – even though that never occurred.

70.     When VNAS challenged Higgins regarding the inaccurate tax return, she claimed to terminate VNAS on behalf of Newpath.

71.     While VNAS is a captive manager approved by the Utah Insurance Department, neither Magellan nor Higgins have applied to be an approved captive manager in Utah, and have not been approved as such.

72.     When the payments to Higgins/Curated Financial and the misconduct by Higgins came to light in October 2022, she was directed not to undertake any further action in respect of Newpath, either directly or through Magellan.  See Suspension Letter, attached as Exhibit 25.

73.     Instead of following those directives, Higgins and Sztyndor lashed out and sent a series of threatening communications to the Board of Directors, to the lawyer who transmitted the Suspension Letter on behalf of Newpath, and to the lawyers who were copied as counsel for other parties.

74.     On October 13, 2022, after discovering the inaccurate and improper tax filings by Higgins, VNAS worked with Newpath's President to initiate a transfer of $150,691 for taxes and fees owed.  $135,691 of that transfer was for 2021 tax due and 2022 estimated federal tax payments for Newpath; the remainder was for captive management fees owed to VNAS.

75.     In response, Higgins contacted Wells Fargo Bank to put a "fraud alert" on one of Newpath's business checking accounts, thereby freezing the funds in that account for several

weeks until the legitimate Directors and Officers of Newpath were able to step in and regain control.

### Higgins, Sztyndor and Wilson Attempt to Take Over the Newpath Board of Directors

76.     In April 2022, two of Newpath's Class B Directors sent emails announcing their resignation, leaving Kristof Wild and Ross Elliott serving as the remaining directors of Newpath.

77.     Without awaiting a vote of the members of Newpath as provided for in the Bylaws (Exh. 14, Art. 3.6), Higgins unilaterally prepared and circulated a "Written Consent of the Board of Directors to Action Taken Without a Meeting," which was dated as of August 18, 2022.  See Exhibit 26.

78.     The instrument purports to change the address for the Company to a non-existent street address in Draper, Utah, and appoint Sztyndor and Wilson to the Board of Directors.  See id.  Shortly thereafter, Higgins directed payments from a Newpath bank account, in the amount of $5,000 each to Sztyndor and Wilson.

79.     At no point in time was the Class A Director, Ross Elliott, informed on the Written Consent instrument; nor has Mr. Elliott signed that instrument as required for such action in lieu of a meeting under the Newpath Bylaws.

80.     Further, the Defendants never advised the Utah Insurance Department of the purported appointment of Sztyndor and Wilson to the Newpath Board of Directors – as required under Utah Administrative Rule R590-238-14.

81.     Nor has the Utah Insurance Department approved of Sztyndor and Wilson serving as Directors for Newpath.

## COUNT I - DECLARATORY JUDGMENT

### Elliott and Wild are the only Directors for Newpath

82.     Plaintiff restates and incorporates by reference herein each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.     Sztyndor and Wilson were not duly elected by the members of Newpath, or by unanimous consent by the remaining directors (Elliott and Wild) – as required under the Bylaws.

84.     Nor were Sztyndor and Wilson approved by the Utah Insurance Department to serve as directors for Newpath.

85.     Any votes in favor of Sztyndor and Wilson serving on the Board of Directors for Newpath were procured through improper omissions and/or outright misrepresentations.

86.     Consequently, Sztyndor and Wilson are not directors for Newpath, and the Court should enter a declaratory judgment to that effect.

## COUNT II - DECLARATORY JUDGMENT

### The Administrative Services Agreement is Invalid

87.     Plaintiff restates and incorporates by reference herein each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     In view of the foregoing, the Administrative Services Agreement was never validly executed by or on behalf of Newpath.

89.     Nor has Magellan performed under the Administrative Services Agreement.

90.     Nor can Magellan perform under the Administrative Services Agreement, as a matter of fact and Utah law.

SLC_6050304.1

91.     Thus, Newpath owes no further obligations to Magellan under that Agreement.

92.     Nor should Magellan have any control over Newpath.

93.     The Court should declare that the Administrative Services Agreement is ineffective, and has been breached in any event by Magellan.

## COUNT III - CONVERSION / MISAPPROPRIATION OF ASSETS

**Higgins, Sztyndor, Wilson, Curated Financial
and/or Curated Funds Are Liable to Newpath**

94.     Plaintiff restates and incorporates by reference herein each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.     In view of the foregoing, Defendants misappropriated money from Newpath to which they had no lawful claim, in the amounts to be proven at trial.

96.     Defendants likewise misappropriated money from Newpath by diverting it to professionals whom they hired for their own personal benefit, under the guise of controlling Newpath.

97.     Plaintiff is entitled to recover damages from Defendants based on their misappropriation of funds from Newpath.

## COUNT IV - BREACHES OF FIDUCIARY DUTY

**Higgins, Sztyndor and Wilson Are Liable to Newpath**

98.     Plaintiff restates and incorporates by reference herein each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.     The individual Defendants claim to hold fiduciary roles in respect of Newpath.

100.    In view of the circumstances detailed above, those individual Defendants have breached the fiduciary duties they claim to owe, and caused harm to Newpath.

22

101.    Such harm includes, but is not limited to, the loss of business opportunities and the liquid assets summarized above.

102.    To redress such breaches, Plaintiff is entitled to recover damages from Higgins, Sztyndor and Wilson.

### COUNT V - AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

**Higgins, Sztyndor, Wilson, Curated Financial, and
Curated Fund of Funds Are Liable to Newpath**

103.    Plaintiff restates and incorporates by reference herein each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    The aforementioned Defendants knowingly provided substantial aid and encouragement to fiduciaries who breached their fiduciary duties to Newpath, thereby causing damage to Newpath.

105.    In compensation for such aiding and abetting, Plaintiff is entitled to recover damages from Higgins, Sztyndor, Wilson, Curated Financial, and Curated Fund of Funds.

### COUNT VI - INTERFERENCE WITH ECONOMIC RELATIONS

**Higgins, Sztyndor and Wilson Are Liable to Newpath**

106.    Plaintiff restates and incorporates by reference herein each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

107.    Newpath has a reasonable expectation of economic benefit from its business relationships with VNAS, Redirect Health, Modern Business Council, the Utah Insurance Department, the Internal Revenue Services, and others.

108.    Defendants knew that Newpath maintains the valuable economic relationships referenced above.

23

SLC_6050304.1

109.     Defendants knew or should have known that their acts and omissions would likely interfere with Newpath's valuable economic relationships.

110.     Newpath has suffered, and will continue to suffer, harm to its valuable economic relationships as a result of Defendants' intentional interference with same, including but not limited to the economic harm that stems from having to rectify and address Defendants' misconduct.

111.     Newpath is entitled to recover damages stemming from Defendants' interference with its economic relationships.

## COUNT VII - NEGLIGENT AND/OR INTENTIONAL MISREPRESENTATION

### Higgins, Sztyndor and Wilson Are Liable to Newpath

112.     Plaintiff restates and incorporates by reference herein each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.     The aforementioned Defendants jointly misrepresented and otherwise led Newpath officials to believe that: (i) Magellan had a valid Administrative Services Agreement with Newpath; (ii) Magellan was ready, willing and able to provide services under that Administrative Services Agreement; and (iii) Higgins validly inherited or otherwise obtained control of Magellan upon the death of Alexander Burns.

114.     The Defendants knew that those representations of fact were not true.

115.     Defendants failed to use reasonable care to determine whether their representations were true.

116.     Defendants were in a better position than Newpath to know the true facts.

SLC_6050304.1

117.    Defendants had a financial interest in the aforementioned misrepresentations, and the transactions that were induced by same.

118.    Newpath officials relied on the aforementioned misrepresentations to Newpath's detriment, which reliance was reasonable under the circumstances.

119.    Newpath suffered damage as a result of relying on the aforementioned misrepresentations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief from this Court:

1.    An award of compensatory and punitive damages;

2.    An award of all costs, including reasonable attorneys' fees;

3.    A judgment declaring the lawful Board of Directors for Newpath, and that Newpath owes no further duty to Magellan under the Administrative Services Agreement;

4.    For a trial by jury on all issues so triable; and

5.    All further relief as the Court may deem just and equitable.

DATED this 9th day of November 2022.

Respectfully submitted,

*/s/ Mark R. Nelson*
Andrew V. Wright
Mark R. Nelson
Benjamin J. Lewis (*pro hac vice pending*)
*Attorneys for Plaintiff*

Plaintiff's address:
222 South Main Street, Suite 500
Salt Lake City, Utah 84101

25

## **INDEX OF EXHIBITS**

1.  Higgins Biography Webpage
2.  November 3, 2021 – <u>The Florida Bar v. Robyn Lynn Sztyndor</u>, Report of Referee
3.  November 24, 2021 – <u>The Florida Bar v. Robyn Lynn Sztyndor</u>, Order
4.  Robyn Sztyndor Website
5.  Higgins Instagram Post
6.  The Remedy IV Website
7.  Curated Funds Website
8.  March 21, 2022 – <u>Alex Burns Estate</u>, Report of the Special Administrator
9.  February 12, 2021 – Certificate of Public Good
10. February 12, 2021 – Articles of Incorporation
11. March 22, 2021 – Certificate of Authority
12. February 24, 2021 – Action by the Board of Directors
13. March 9, 2021 – Surplus Note
14. February 17, 2021 – Bylaws
15. October 18, 2018 – WSJ Article - "Finance & Markets: SEC Charges Financier with Fraud"
16. March 21, 2015 – WSJ Article - "Investigators Sift Rubble Of Fallen Financier's Empire"
17. October 16, 2018 – <u>Securities and Exchange Commission v. Burns</u>, Complaint
18. February 14, 2022 – Correspondence of Special Administrator
19. January 17, 2022 – Correspondence to Higgins
20. January 21, 2022 – Resolutions of Continuum Fiduciary Management and York Holdings
21. February 10, 2022 – Cease and Desist Letter from Sztyndor
22. January 1, 2021 – Equity Contribution Agreement (pertinent pages only)
23. January 1, 2022 – Amendment to Administrative Services Agreement (putative)
24. September 30, 2020 – Administrative Services Agreement (putative)
25. October 17, 2022 – Suspension Letter to Higgins
26. August 18, 2022 – Written Consent of Board of Directors without a Meeting (putative)

SLC_6050304.1