IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NEWPATH MUTUAL INSURANCE CO., <br><br> Plaintiff, <br><br> v. <br><br> JESSICA HIGGINS; JARROD WILSON, M.D.; CURATED FUND OF FUNDS, LP; CURATED FINANCIAL, INC.; MAGELLAN ADMINISTRATION CO., <br><br> Defendants. | **ORDER AND MEMORANDUM DECISION DENYING MOTION TO DISMISS** <br><br> Case No. 2:22-cv-709-TC-DAO <br><br> Judge Tena Campbell <br> Magistrate Judge Daphne A. Oberg |

There are several motions currently pending in this action. Defendants Curated Fund of Funds, LP, and Curated Financial, Inc. (collectively, the Curated Entities), as well as Defendant Jarrod Wilson, M.D., have moved to set aside the defaults entered against them (ECF No. 54). Defendant Jessica Higgins has moved to set aside the Answer filed by Defendant Magellan Administration Co. (Magellan) (ECF No. 57). All defendants who have not settled the claims against them have moved to dismiss the action, arguing that this court lacks personal jurisdiction over them (ECF No. 55). Plaintiff Newpath Mutual Insurance Co. (Newpath) opposes these motions and, in the alternative, has moved for jurisdictional discovery (ECF No. 72). Finally, Newpath moves to strike the declaration filed by Ms. Higgins on the ground that it contains inaccuracies and further moves to strike any motions or argument filed by Magellan and the Curated Entities, arguing that these business entities are no longer represented by counsel (ECF No. 84).

For the reasons stated below, the court finds that the Curated Entities have not excused

the default entered against them.  The court will set aside the default entered against Dr. Wilson but orders both Dr. Wilson and Ms. Higgins to file a notice of appearance or risk the entry of default judgment against them.  The court further finds that the non-defaulted defendants—Dr. Wilson, Ms. Higgins, and Magellan—are properly subject to this court's jurisdiction due to their activities directed at Utah.  Finally, the court resolves the dispute over Magellan's proper representation in favor of Newpath but will grant Ms. Higgins leave to file a crossclaim against Magellan to assert her claims about Magellan's ownership.

**BACKGROUND**[1]

This case concerns a dispute about who controls Newpath, a captive insurance company established in Utah.  Newpath alleges that Ms. Higgins, Dr. Wilson, and Defendant Robyn Lynn Sztyndor (who settled her claims with Newpath after this suit was filed) improperly wrested control of Newpath's Board of Directors and misappropriated funds from the company under false pretenses.

## I. Formation of Newpath

Newpath was created on February 21, 2021, as an association captive insurance company as that term is defined by Utah Code Ann. § 31A-37-102(5).  (Compl., ECF No. 2 at ¶¶ 16–17.) As a captive insurance company, Newpath provides insurance for a specific group of affiliated businesses: "The membership of the Corporation shall consist [of] all persons or entities holding contracts of insurance issued by the Corporation and who comply with the membership

---

[1] Except where otherwise noted, the court summarizes the facts from the allegations made in Newpath's Complaint (ECF No. 2), which the court takes as true for the purposes of these motions.

provisions of the bylaws of the corporation." (Newpath Articles of Incorporation, Ex. 10 to Compl., ECF No. 2-11.) Newpath is approved and regulated by the Utah Insurance Company under the Utah Captive Insurance Companies Act. See Utah Code Ann. § 31A-37-101, et seq.

Many of the individuals and businesses who formed Newpath or maintained relationships with Newpath were brought together by Alexander Chatfield Burns, a "former insurance industry wunderkind" who was later the subject of a civil complaint filed by the Securities and Exchange Commission (SEC). (ECF No. 2 at ¶¶ 31, 33.) Mr. Burns worked to rebuild his life after settling the lawsuit with the SEC, and his interactions with Newpath were part of that effort. (Id. ¶ 35.) But Mr. Burns did not form, control, or have an ownership interest in Newpath. (Id. ¶ 36.)

Instead, the company was established and incorporated under Utah Code Ann. § 31A-37-301(3) by Ross Elliott, a resident of Utah and former Director of the Captive Division of the Utah Insurance Department. (Id. ¶ 21.) Mr. Elliott serves as Newpath's resident director (and sole "Class A" director), as required by Utah Code Ann. § 31A-37-301(5)(a). Additional "Class B" directors of the corporation initially included Robert Goodloe, C. Clay Olson, and Kristof Wild (who was elected President of the corporation). (Id. ¶¶ 23–24.) As is custom for captive insurance companies in Utah, Newpath is managed by a captive management firm approved by the Utah Insurance Department. See Utah Admin. Code R590-238-3(2). That captive management firm is Valley National Administrative Services, LLC (VNAS), which is located in Covington, Kentucky. (ECF No. 2 at ¶¶ 3, 20.)

## II. Ownership of Magellan

Mr. Burns committed suicide on October 26, 2021. (Id. ¶ 40.) His death led to probate proceedings in South Carolina, in which the Charleston County Probate Court appointed Seth

3

Whitaker as a special administrator and later a personal representative of the Estate of Alexander Chatfield Burns (the Burns Estate).  (Id. ¶¶ 46–47; Decl. Seth Whitaker, Ex. B to Resp. to Mot. to Set Aside Answer, ECF No. 68-2 at ¶ 2.)  Among other duties, Mr. Whitaker undertook an investigation of Mr. Burns's assets to determine which assets might be subject to creditor claims and which were available for distribution to his heirs.  (ECF No. 68-2 at ¶ 3.)

Magellan is a corporation organized under Delaware law with a principal place of business in South Carolina.  (ECF No. 2 at ¶ 9.)  Magellan may have been tangentially connected to Newpath during Mr. Burns's life.  (See id. ¶ 39 ("According to Higgins, Decedent Burns proposed an "Administrative Services Agreement" with an entity known as Magellan, to the initial board of directors for Newpath, in early 2020 or early 2021.").)[2]

Part of Mr. Whitaker's investigation involved a determination that the Burns Estate owned a 90% majority interest in Magellan.  (ECF No. 68-2 at ¶ 4.)  Specifically, Mr. Whitaker found that York Holdings, LLC (York Holdings), a Wyoming limited liability company, owned 90% of the outstanding stock of Magellan.[3]  (Id.)  In turn, Mr. Whitaker determined that York Holdings was owned by two trusts and that the trustee of both trusts was Continuum Fiduciary Management, LLC (Continuum), a Wyoming limited liability company and private family trust company that was owned at all times since its formation by Mr. Burns or his estate.  (Id. ¶¶ 4–5.)

---

[2] It is unclear whether the proposed relationship between Newpath and Magellan would have supplanted the management role performed by VNAS or whether Magellan would have supplied other administrative services.

[3] The parties do not dispute that the remaining 10% of Magellan stock is owned by Redirect Health, LLC (Redirect Health) (see Mot. to Set Aside Answer, ECF No. 57 at 2; Resp. to Mot. to Set Aside Answer, ECF No. 68 at 3), although Magellan points out that Redirect Health disagrees with this point (ECF No. 68 at 3).

Ms. Higgins—a marketing and business growth consultant (ECF No. 2 at ¶ 4 (citing Ms. Higgins's blog and websites)), who, according to Newpath, was living with Mr. Burns at the time of his death (id. ¶ 41)—disputes these assertions and maintains that she is the sole member and manager of York Holdings, and therefore the majority shareholder of Magellan.  (Decl. Jessica Higgins, Ex. B to Mot. to Set Aside Answer, ECF No. 57-2 at ¶¶ 17, 24.)

During his investigation, Mr. Whitaker asked Ms. Higgins to provide information about her association with Mr. Burns and his companies.  (ECF No. 2 at ¶ 50.)  Mr. Whitaker later accused Ms. Higgins of providing him with forged documents.  (Id. ¶ 51.)  Acting as the sole member of Continuum and manager of York Holdings, Mr. Whitaker executed corporate Resolutions to remove Ms. Higgins from any positions she claimed to hold with Continuum (the parent company of York Holdings) and York Holdings (the parent company of Magellan).  (Id. ¶ 53; Resolutions dated Jan. 21, 2022, Ex. 20 to Compl., ECF No. 2-21.)

On March 21, 2022, Mr. Whitaker filed an inventory and report with the probate court in South Carolina that included details about his actions to secure control over Continuum and York Holdings.  (ECF No. 2 at ¶ 56; Report of Special Administrator, Ex. 8 to Compl., ECF No. 2-9.) Ms. Higgins did not timely file any claims against the Burns Estate, did not timely file any claim that she owned or controlled the assets included in Mr. Whitaker's inventory and report, and did not challenge Mr. Whitaker's conduct in any legal proceeding.  (ECF No. 2 at ¶¶ 58–61.)

## III.  Control of Newpath

Newpath alleges that, after Mr. Burns's suicide, Ms. Higgins initiated a series of actions designed to gain control over first York Holdings—and therefore Magellan—and ultimately Newpath.  First, Ms. Higgins sent an email to the general counsel of Redirect Health on October

26, 2021—the day of Mr. Burns's death—, that listed herself as the correct contact for York Holdings and stated that she was authorized to manage York Holding's portfolio.  (Id. ¶ 43.)  Then, in early 2022, Ms. Higgins approached Mr. Wild (Newpath's president) and convinced him to sign an "Amendment to Administrative Services Agreement" that was dated January 1, 2022.  (Id. ¶ 62.)  The purported amendment stated that the Administrative Services Agreement between Newpath and Magellan was "initially dated the 30th day of September 2020" (therefore suggesting that the amendment was a change to an existing agreement), but Newpath alleges that subsequent investigation did not uncover the existence of any prior agreement between Newpath and Magellan.  (Id. ¶¶ 62, 66.)  Mr. Wild signed the amendment under the belief that a valid agreement had previously existed.  (Id. ¶ 63.)  Purporting to act for Magellan, Ms. Higgins also agreed to reduce the monthly fee charged by Magellan from 8.75% to 5% of Newpath's premium payments.  (Id. ¶ 62.)[4]

Thereafter, Newpath alleges that Ms. Higgins asserted control over Newpath bank accounts, filed inaccurate tax returns, and directed $144,400 of Newpath funds to her affiliated businesses, the Curated Entities.  (Id. ¶¶ 64, 68.)  After VNAS confronted Ms. Higgins about the inaccurate tax return, Ms. Higgins claimed to terminate VNAS's relationship with Newpath— although the Utah Insurance Department has not approved any other captive manager for Newpath.  (Id. ¶¶ 70–71.)  On August 18, 2022, Ms. Higgins prepared and circulated a "Written Consent of the Board of Directors to Action Taken without a Meeting," which purported to

---

[4] Because there is no evidence of a prior agreement, it is unclear whether Magellan had ever charged the higher rate.  It is also unclear how the administrative services that Magellan offered to Newpath in the amendment differed from the management services provided by VNAS.  Newpath asserts that these duties overlapped.  (ECF No. 2 at ¶ 67.)

change the company's address to Draper, Utah, and to appoint Ms. Sztyndor and Dr. Wilson to the board.[5] (Id. ¶¶ 77–78.) Ms. Higgins also directed payments of $5,000 to both Ms. Sztyndor and Dr. Wilson. (Id. ¶ 78.) The Utah Insurance Department has not approved of Ms. Sztyndor and Dr. Wilson as directors for Newpath. (Id. ¶ 81.)

### IV. Procedural History of This Action

On November 9, 2022, Newpath brought suit against Ms. Higgins, Dr. Wilson, Ms. Sztyndor, the Curated Entities, and Magellan. (See ECF No. 2.) Newpath asserted the following causes of actions: 1) declaratory judgment that Mr. Elliott and Mr. Wild are Newpath's only directors; 2) declaratory judgment that the Administration Services Agreement between Newpath and Magellan is invalid; 3) conversion or misappropriation of funds against all defendants except Magellan; 4) breach of fiduciary duty against the individual defendants; 5) aiding and abetting breaches of fiduciary duty against all defendants except Magellan; 6) interference with economic relations against the individual defendants; and 7) negligent and intentional misrepresentation against the individual defendants. (Id. ¶¶ 82–119.)

Newpath returned proof of service for all defendants except Ms. Higgins, for whom Newpath moved the court to allow alternative service of process. (ECF No. 32.) The only defendant in this action to file an answer was Magellan. (See ECF No. 18.) Newpath sought and obtained entry of default against Dr. Wilson, Ms. Sztyndor, and the Curated Entities. (ECF

---

[5] Mr. Goodloe and Mr. Olson had resigned as Newpath's directors in April 2022, leaving two remaining directors: Mr. Wild and Mr. Elliott. (ECF No. 2 at ¶ 76.) Mr. Wild signed the document appointing Ms. Sztyndor and Dr. Wilson to the Board. (See Written Consent Board of Directors, Ex. 3 to Pl.'s Opp'n to Mot. to Dismiss, ECF No. 66-3 at 4.) But Mr. Elliott did not. (See id.) There is no evidence that either Mr. Wild or Mr. Elliott resigned as directors at any time.

Nos. 22, 33, 36–37.)  Ms. Sztyndor eventually moved to set aside the entry of default against her but reached a settlement with Newpath before the court heard her motion.  (See Order Granting Mot. to Enforce Settlement dated July 17, 2023, ECF No. 52.)  Several weeks later, on August 11, 2023, Ms. Higgins, Dr. Wilson, and the Curated Entities moved to dismiss for lack of personal jurisdiction (ECF No. 55).  The defaulted parties (Dr. Wilson and the Curated Entities) also moved to set aside the entry of default against them (ECF No. 54).  Finally, Ms. Higgins moved to set aside the answer previously filed by Magellan, asserting that Ms. Higgins—through York Holdings—was the majority shareholder of Magellan and had not consented to representation by Aaron Johnstun, an attorney working on behalf of Magellan under the theory that the Burns Estate (and its representative, Mr. Whitaker), were the rightful majority owners of Magellan.  (ECF No. 57.)

Newpath opposed each of these motions and moved the court for discovery on the issue of jurisdiction if the court was not convinced that it had personal jurisdiction over the Defendants.  (ECF No. 72.)

The court held a hearing on these motions on October 23, 2023.  A few months later, the attorneys representing Ms. Higgins, Dr. Wilson, the Curated Entities, and—purportedly—Magellan moved to withdraw from the case, citing outstanding obligations that had not been fulfilled by the Defendants.  (ECF No. 82.)  The court granted that motion on January 30, 2024, and ordered the Defendants to file a notice of appearance within 21 days.  (See Order Granting Mot. to Withdraw dated Jan. 30, 2024, ECF No. 83 at 2.)  Although the court noted that Ms. Higgins and Dr. Wilson could file either a pro se appearance or have new counsel file a notice of appearance, the court reminded the Curated Entities that business entities may not appear pro se

and must be represented by an attorney who is admitted to practice in this court.  (Id.)  The court

mailed copies of its order to the addresses on file and did not receive any returned mail.

No Defendants have since filed notices of appearances.  As a result, Newpath now moves

the court to strike the filings and motions of the Curated Entities and Magellan (at least, any

filings not written by Mr. Johnstun) on the ground that these entities are unrepresented by

counsel.  (ECF No. 84.)  In addition, Newpath asserts that the declaration of Ms. Higgins

contains materially false information about her address and should be disregarded.

## ANALYSIS

### I.  Motion to Set Aside Defaults

Rule 55(c) of the Federal Rules of Civil Procedure allows a court to "set aside an entry of

default for good cause …."  To determine whether good cause exists to excuse a default, the

court considers: "(1) whether the default was the result of culpable conduct of the defendant,

(2) whether the plaintiff would be prejudiced if the default should be set aside, and (3) whether

the defendant presented a meritorious defense."  Hunt v. Ford Motor Co., 65 F.3d 178, 1995 WL

523646, at *3 (10th Cir. 1995) (unpublished table decision) (citing In re Dierschke, 975 F.2d

181, 183 (5th Cir. 1992)).  A defendant is culpable "only if the party defaulted willfully or has no

excuse for default."  Strupp v. Atlas Glob., LLC, No. 2:18-cv-168-DN, 2018 WL 3405269, at *2

(D. Utah July 12, 2018) (citing Hunt, 1995 WL 523646, at *3).  Furthermore, "failure to answer

or otherwise respond to the complaint after receiving actual notice of the complaint

demonstrate[s] a willful disregard for the Court."  Id. (citing Hunt, 1995 WL 523646, at *4).

The court entered default against Dr. Wilson on May 22, 2023.  (ECF No. 33.)  The

process server who served Dr. Wilson states that he left a copy of the summons and complaint at

Dr. Wilson's Miami residence with his "co-resident/girlfriend." (Executed Summons for Jarrod Wilson, ECF No. 19.) Dr. Wilson has provided a sworn declaration stating that he lives alone and has no co-tenants and that the process server must have delivered the summons and complaint to a "friend that was painting my garage." (Decl. Jarrod Wilson, ECF No. 54 at 10 ¶¶ 7–9.) Dr. Wilson's explanation is suspicious, as it provides little detail and does not explain why he believes that his friend was served, why his friend threw away the papers without alerting him, or why the process server believed he had delivered the summons and complaint to Dr. Wilson's girlfriend. Nevertheless, Dr. Wilson has provided a sworn declaration and Newpath has not submitted evidence refuting Dr. Wilson's assertions. The court also prefers to decide cases on their merits and finds that Newpath would not be prejudiced if the court set aside the entry of default against Dr. Wilson, as the case is still relatively new. The court therefore grants Dr. Wilson's motion and sets aside the entry of default against him.

The Curated Entities also move to set aside the default entered against them. Ms. Higgins, who owns and operates the Curated Entities, states that she never received actual notice or receipt of the summons and complaint. (Decl. Jessica Higgins, ECF No. 54 at 16 ¶ 30.) But she does not dispute that Newpath's president, Mr. Wild, "directed Newpath to serve Curated Financial and Curated Funds through their Delaware registered agent." (Id. at 15 ¶ 29.) Instead, she asserts that Mr. Wild was aware that the Curated Entities were owned and operated by Ms. Higgins and was also aware of Ms. Higgins's Florida address, which was near Mr. Wild's residence. (Id. at 15 ¶¶ 27–28.) She argues that Newpath therefore should have served her at her Florida home.

Ms. Higgins's argument is wholly unpersuasive. Rule 4 of the Federal Rules of Civil

10

Procedure allows a plaintiff to serve the registered agent for a company—indeed, acceptance of service is one of the primary functions of a registered agent—and does not require service on an officer of the company.  See Fed. R. Civ. P. 4(h)(1)(B).  Furthermore, Ms. Higgins states that she retained counsel in June 2023 (ECF No. 54 at 15 ¶ 26), demonstrating that she had actual notice of the lawsuit[6] over a month before the Curated Entities filed their motion to set aside default on August 11, 2023.  The Curated Entities have not attempted to show good cause for this delay.

The court therefore denies the motion to set aside the defaults against the Curated Entities.  Because Ms. Higgins owns and operates the Curated Entities (see id. at 14 ¶ 13), their lack of participation is unlikely to have a significant effect on the outcome of the lawsuit.

## II. Motion to Set Aside Magellan's Answer

Ms. Higgins moves the court to set aside Magellan's previously filed answer, which was written by Mr. Johnstun acting as counsel for Mr. Whitaker and the Burns Estate.  Ms. Higgins asserts that she is the sole owner and member of York Holdings who, in turn, owns 90% of the outstanding stock in Magellan.  Mr. Whitaker counters that this matter has already been adjudicated by a South Carolina probate court and that the Burns Estate is the owner of York Holdings (and therefore Magellan).

Ms. Higgins provides three pieces of evidence to support her contention: 1) her declaration stating that she is the sole owner of York Holdings, who is the majority shareholder of Magellan (ECF No. 57-2); 2) an Assignment of Stock purporting to transfer 100 shares of

---

[6] In a previous motion for alternative service (ECF No. 32), Newpath detailed its numerous attempts to serve Ms. Higgins and provided evidence of an email from Benjamin Lewis dated May 9, 2023, in which Ms. Higgins was emailed a copy of the summons and complaint.  (Email from Benjamin J. Lewis to Jessica Higgins dated May 9, 2023, ECF No. 32-5.)

Magellan stock from York Holdings to Redirect Health, signed by Ms. Higgins as an

"Authorized Signatory" and "Manager of York Holdings" (ECF No. 57-1); and 3) a Corporate

Operating Agreement, signed only by Ms. Higgins, that purports to establish York Holdings as a

single member limited liability company in Wyoming with Ms. Higgins as the sole member

(ECF No. 57-3).

These documents are not convincing. The Assignment of Stock, dated January 1, 2021

(before the death of Mr. Burns), merely demonstrates that Ms. Higgins may have had the

authority to sign documents on behalf of York Holdings at some point before Mr. Burns died—

or at least that Redirect Health believed she had this authority. An assignment of stock does not

provide clear evidence about the ownership of York Holdings. The Corporate Operating

Agreement is even less persuasive. It is unclear what this document is or whether it was ever

filed with the Wyoming Secretary of State. Although the document notes that York Holdings

"was formed on August 21, 2017, when the Member(s) filed the Articles of Organization with

the office of the Secretary of State" (ECF No. 57-3 at 2), Ms. Higgins has not provided the

referenced Articles of Organization or any other official filings or tax returns.[7]

In contrast, Newpath provides the following evidence to support its argument that the

Burns Estate is the rightful owner of York Holdings: 1) the declaration of Mr. Whitaker, the

special administrator and later personal representative of the Burns Estate (ECF No. 68-2);

2) evidence of his appointment to these positions by the Charleston County Probate Court (ECF

Nos. 68-1, 68-3); 3) the report Mr. Whitaker filed with the probate court detailing his findings

---

[7] Newpath also notes that there are inconsistencies between the address that is listed for York Holdings in the Corporate Operating Agreement and the address listed in the 2019 annual report for York Holdings. (See ECF No. 68 at 7.)

about the proper ownership of York Holdings (ECF No. 68-4 at 8–10); 4) a Certification of Trust demonstrating that Mr. Burns was the sole member and manager of Continuum, the trustee of the two trusts that Mr. Whitaker asserts own York Holdings (ECF No. 68-5); and 5) Resolutions issued by Continuum and York Holdings (signed by Mr. Whitaker) revoking all agency authority to act as manager for the trust and company that may have previously been granted to Ms. Higgins (ECF No. 68-6).

At this stage of the suit, the court finds that the evidence from the South Carolina probate proceedings is sufficient to establish a prima facie case that the Burns Estate is the rightful owner of York Holdings, and that therefore Mr. Johnstun—who was appointed by the Burns Estate—is the appropriate counsel for Magellan. On this preliminary finding, the court denies Ms. Higgins's motion to set aside Magellan's answer.

The court will, however, grant Ms. Higgins leave to file a crossclaim against Magellan, as a crossclaim is the more appropriate vehicle through which Ms. Higgins may contest Magellan's ownership.

### III. Motion to Dismiss

Ms. Higgins and Dr. Wilson move to dismiss the lawsuit on the ground that the court lacks personal jurisdiction over them.[8] "Personal jurisdiction can be acquired through either

---

[8] Magellan also purports to join this motion. But because the court finds that Mr. Johnstun—and not Ms. Higgins's and Dr. Wilson's former counsel—is the appropriate legal representative for Magellan, and because Mr. Johnstun has not filed a separate motion to dismiss, the court disregards Magellan's participation in the motion. In any event, the court's finding of personal jurisdiction over Ms. Higgins and Dr. Wilson would also apply to Magellan. Newpath alleges that Magellan signed an amendment to an Administrative Services Agreement in which Magellan would provide multiple administrative services to Newpath, a Utah company. For the reasons stated below, the court finds that these facts are sufficient to establish the requisite

general jurisdiction or specific jurisdiction." <u>Xmission, L.C. v. Fluent LLC</u>, 955 F.3d 833, 840 (10th Cir. 2020).  Newpath maintains the court has specific jurisdiction in this action.  "Specific jurisdiction … allows a court to exercise jurisdiction over an out-of-state defendant only for claims related to the defendant's contacts with the forum State."  <u>Id.</u>

To determine whether this court has jurisdiction, the court must analyze whether exercising jurisdiction over the Defendants comports with due process.[9]  <u>Id.</u> at 839.  To do this, the court considers whether the Defendants have minimum contacts with Utah "such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'"  <u>Dudnikov v. Chalk & Vermillion Fine Arts, Inc.</u>, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)).  That is, a defendant's contacts with the forum state "must be such that the defendant should reasonably anticipate being haled into court there.'"  <u>Xmission</u>, 955 F.3d at 839–40 (quoting <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980)).

Newpath has the burden to establish jurisdiction.  <u>See id.</u> at 839.  But because the court is not conducting an evidentiary hearing, Newpath need only make a prima facie showing that personal jurisdiction exists.  <u>See id.</u>  Newpath can establish jurisdiction through affidavits or other written materials, including the complaint (to the extent the Defendants have not presented

---

minimum contacts.

[9] "A federal court may not exercise personal jurisdiction over an out-of-state defendant unless (1) an applicable statute authorizes service of process on that defendant and (2) the exercise of statutory jurisdiction comports with constitutional due process."  <u>Xmission</u>, 955 F.3d at 839. Utah's long-arm statute applies, but it "confers jurisdiction 'to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution.'"  <u>Id.</u> (quoting <u>Fenn v. Mleads Enters., Inc.</u>, 137 P.3d 706, 710 n.10 (Utah 2006)).  "The two-step analysis thus collapses here into a single due-process inquiry."  <u>Id.</u>

evidence contradicting those allegations).  See id.  The court must take uncontroverted well-pled allegations in the complaint as true.  See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995).  If the plaintiff establishes the defendant has minimum contacts with the forum state, the defendant, to avoid litigating in the forum state, must present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." Xmission, 955 F.3d at 840 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

**1.  Minimum Contacts**

"Specific jurisdiction is proper if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'"  Id. (quoting Burger King, 471 U.S. at 472).

a.  Purposeful Direction

To conclude that the Defendants purposefully directed their activities at Utah, the court must find a substantial connection between their activities and Utah.  Emps. Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1160 (10th Cir. 2010).  This connection ensures the court does not require an out-of-state defendant to account for "random, fortuitous, or attenuated contacts" with the forum state, "the unilateral activity of another party or third person," or "the mere foreseeability that its actions may cause injury in that jurisdiction."  Xmission, 955 F.3d at 840–41 (cleaned up).

A plaintiff may establish purposeful direction by showing that "an out-of-state defendant's intentional conduct targets and has substantial harmful effects in the forum state." Old Republic Ins. Co. v. Cont'l Motors, Inc., 877 F.3d 895, 907 (10th Cir. 2017).  The United States Supreme Court laid out the harmful effects test in Calder v. Jones, 465 U.S. 783 (1984).

15

Calder requires a plaintiff to show that the defendant (1) intentionally committed an act (2) expressly aimed at the forum state (3) with the "knowledge that the brunt of the injury" would be felt in that state.  Dudnikov, 514 F.3d at 1072.

Under the circumstances here, Newpath has established that both Ms. Higgins and Dr. Wilson purposefully directed their activities at Utah.

Newpath alleges numerous activities committed by Ms. Higgins that were intentionally directed at Utah.  Taking Newpath's well-pled allegations as true, Ms. Higgins induced the president of a Utah company to enter into an Administrative Services Agreement with Magellan, thereby partially or totally supplanting Newpath's relationship with VNAS, the captive management firm approved by the Utah Insurance Department.  Ms. Higgins then misappropriated $144,000 from Newpath and directed this money to the Curated Entities.  Ms. Higgins also filed inaccurate tax returns and put a fraud alert on one of Newpath's business checking accounts at Wells Fargo Bank.  Finally, Ms. Higgins circulated a Written Consent of the Board of Directors to Action Taken without a Meeting, a document which purported to put Dr. Wilson and Ms. Sztyndor on the Board of Directors and move the address of the company to Draper, Utah.  (See ECF No. 66-3.)

Although the allegations against Dr. Wilson are less extensive, Newpath accuses him of attempting to usurp rightful control of the company by serving on the Board of Directors and failing to inform the Utah Insurance Department of his appointment.  Newpath also alleges that Dr. Wilson accepted payment of $5,000 from a Newpath bank account.  Dr. Wilson does not dispute that he is a member of Newpath's Board of Directors.  (See ECF No. 55 at 10 ("Wilson has never visited Utah, and he has never conducted any business in Utah in his capacity as a

member of Newpath's Board of Directors.").)

The court agrees with Newpath that the Tenth Circuit has found purposeful availment in analogous circumstances. In <u>Newsome v. Gallacher</u>, the Tenth Circuit considered a dispute between Mahalo Energy USA (Mahalo USA), a Delaware corporation whose principal place of business was in Oklahoma, and its Canadian parent corporation, Mahalo Energy Ltd. (Mahalo Canada). 722 F.3d 1257 (10th Cir. 2013). Mahalo USA alleged that Mahalo Canada had put it into bankruptcy by shifting unsustainable debt to Mahalo USA and using Mahalo USA's assets as partial security for a revolving credit line. <u>Id.</u> at 1262.

Mahalo USA's trustee brought suit against the individual officers and directors of Mahalo Canada, all of whom lived in Alberta, asserting breaches of their fiduciary duties. The Tenth Circuit noted: "Every alleged breach originated in Alberta without any contact with Oklahoma." <u>Id.</u> at 1263. Nevertheless, the court, having determined there was no question that the alleged acts were intentional, found that the second and third prongs of the purposeful availment analysis were satisfied:

> Here, the individual defendants do not contest that they knew Mahalo USA operated exclusively in Oklahoma, making Oklahoma the focal point of any tort against Mahalo USA they may have committed. Accordingly, Newsome has established that these defendants expressly aimed their actions at Oklahoma when they acted toward Mahalo USA.
>
> The final requirement is knowledge that the brunt of the injury would be felt in the forum state. We have already concluded Newsome established that the individual defendants knew Mahalo USA's business operated in Oklahoma. At the pleading phase, then, it is a fair inference that the individual defendants knew that the brunt of any injury to Mahalo USA would be felt in Oklahoma.

<u>Id.</u> at 1269.

Similarly, the Defendants here are well aware that Newpath is a Utah corporation

regulated under Utah law.  (See, e.g., Email from Jessica Higgins to Robert J. Barker, ccing

Jarrod Wilson, dated Oct. 18, 2022, ECF No. 66-5 (demonstrating Ms. Higgins's knowledge that

Utah regulations required Newpath to report at least three board members to the State of Utah,

and referencing Utah's tax filing requirements).)  And although Newpath is managed by a

captive management firm in Kentucky and may do business with non-Utah entities, it is a fair

inference that the Defendants would know that any damage to Newpath's finances or reputation

would be felt primarily in Utah.

Elsewhere in the country, a district court has found personal jurisdiction against an

entity's board of directors where the plaintiff alleged that the directors "were self-perpetuating

and in total control of the corporation; … the directors participated in wrongful activities going

to the very essence of that corporation's existence; … and at least one of those acts of alleged

wrongdoing indubitably occurred in the [forum state]."  Jericho Baptist Church Ministries, Inc.

(D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.), 223 F. Supp. 3d 1, 6 (D.D.C. 2016)

(cleaned up).

Here, Newpath alleges that Ms. Higgins, Ms. Sztyndor, and Dr. Wilson commandeered

the Board of Directors and took actions—including misappropriating funds, failing to comply

with state regulations, and filing incorrect tax returns—that went to the heart of Newpath's

existence.  By purporting to move Newpath's address to an address in Draper, Utah, at least one

of these acts occurred in the forum state.

Given the above findings, Newpath has satisfied the Calder test and has established that

both Ms. Higgins and Dr. Wilson purposefully directed their activities at Utah.

b.  Arises Out of or Relates to Defendant's Forum Activities

To establish specific jurisdiction, Newpath must also show that its alleged injuries arose out of, or related to, the Defendants' activities.  Xmission, 955 F.3d at 840.  "The arising-out-of component of the test requires courts to ensure that there is an adequate link between the forum State and the claims at issue, regardless of the extent of a defendant's other activities connected to the forum."  Id. (citing Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cty., 582 U.S. 255, 263 (2017)).  To that end, the court must ask whether there is "an affiliation between the forum and underlying controversy …."  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (cleaned up).[10]

For the reasons already discussed, Newpath has sufficiently established this element for Ms. Higgins and Dr. Wilson.  These individuals purposefully directed their activities at Utah when they purported to take control of the Board of Directors and management of a Utah company, making decisions that concerned Utah regulations and taxes.

Considering Newpath's allegations, the court finds Newpath has established that both Ms. Higgins and Dr. Wilson have minimum contacts with Utah.

**2.  Traditional Notions of Fair Play and Substantial Justice**

Because Newpath has established a prima facie case of personal jurisdiction, the court must determine whether exercising personal jurisdiction over Ms. Higgins or Dr. Wilson would "offend traditional notions of fair play and substantial justice."  Xmission, 955 F.3d at 839

---

[10] Although the clause "arises out of" concerns causation, the "or related to" clause "contemplates that some relationships will support jurisdiction without a causal showing."  Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351, 362 (2021).

(cleaned up).  At this stage of the analysis, the Defendants, to avoid litigating in Utah, must

"present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable."  <u>Burger King</u>, 471 U.S. at 477.  To assess whether the court may

require the Defendants to litigate this matter in Utah, the court must consider:

> (1) the burden on the defendant, (2) the forum State's interest in resolving the
> dispute, (3) the plaintiff's interest in receiving convenient and effective relief,
> (4) the interstate judicial system's interest in obtaining the most efficient
> resolution of controversies, and (5) the shared interest of the several states in
> furthering fundamental substantive social policies.

<u>OMI Holdings, Inc. v. Royal Ins. Co. of Can.</u>, 149 F.3d 1086, 1095 (10th Cir. 1998) (citing

<u>Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano Cty.</u>, 480 U.S. 102, 113 (1987)).

Relying on their arguments about the lack of minimum contacts, Ms. Higgins and Dr.

Wilson do not address these factors.  Nevertheless, the court briefly assures itself that jurisdiction

in Utah would not be unreasonable.

### a.  <u>Burden on the Defendants</u>

Both Ms. Higgins and Dr. Wilson point out that they conduct all their business from

Florida.  But neither has found it difficult to serve on the Board of Directors of a Utah company.

And the court has been willing—for instance, at the hearing held on October 23, 2023—to use

Zoom so that the Defendants may appear remotely.  Appropriate case management and today's

modes of communication should noticeably reduce any burden faced by Ms. Higgins and Dr.

Wilson.  Overall, the burden is not much greater than if the case were to be litigated in Florida.

### b.  <u>Utah's Interest in Resolving the Dispute</u>

Newpath is a Utah company regulated under Utah law.  Given that, Utah has an interest

in resolving the issues arising out of its common law and statutes and protecting the interests of a

Utah company.

### c.   Newpath's Interest in Receiving Convenient and Effective Relief

Newpath's resident director, Mr. Elliott, lives in Utah.  And as a Utah-based company regulated under Utah law, Newpath would certainly find litigating here more convenient.  The Defendants do not argue otherwise.

### d.   The Interstate Judicial System's Interest in Efficient Resolution of the Dispute

Here, the court asks "whether the forum state is the most efficient place to litigate the dispute."  OMI, 149 F.3d at 1097.  Courts look at the "location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation."  Id. (cleaned up).

The witnesses will no doubt come from both Utah and Florida.  Newpath's president, Mr. Wild, apparently lives in Florida, but Newpath's resident director, Mr. Elliott, lives in Utah.  As for the question of where the wrong occurred, the court has discussed above that the brunt of the injury to Newpath was felt in Utah.  As for the choice of law, the parties do not dispute that Utah law applies.  And the parties have not identified any problems with piecemeal litigation.

Given the overall circumstances, litigating this matter in Utah would be just as efficient, if not more efficient, than litigating in Florida or elsewhere.

### e.   States' Interest in Furthering Social Policies

Certainly, Utah has an interest in protecting its policies, which are set forth in its statutes on captive insurance companies.  The Defendants do not point to any specific interest Florida has in the litigation.  Nothing in the record suggests that trying the case in Utah and applying Utah law would negatively affect Florida's policies and interests.  Accordingly, this factor weighs in

favor of Newpath.

        f.   <u>Conclusion</u>

Ms. Higgins and Dr. Wilson have a high burden to establish that the court should not exercise jurisdiction. Given the reasons stated above, and their lack of argument concerning the appropriate factors, they have not presented a compelling case that being required to litigate in Utah would violate their due process rights.

### 3.  Conclusion Finding Specific Jurisdiction

Newpath has established a prima facie case that Ms. Higgins and Dr. Wilson have sufficient minimum contacts with Utah. And although the Defendants have generally asserted that they would be inconvenienced by litigating in Utah, they have not shown a compelling reason why the court should not exercise jurisdiction. "[I]t is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." <u>Peay v. BellSouth Med. Assistance Plan</u>, 205 F.3d 1206, 1212–13 (10th Cir. 2000) (quoting <u>Republic of Pan. v. BCCI Holdings (Lux.) S.A.</u>, 119 F.3d 935, 947 (11th Cir. 1997)). "Certainly, in this age of instant communication and modern transportation, the burdens of litigating in a distant forum have lessened." <u>Id.</u> at 1213 (cleaned up). Requiring Ms. Higgins and Dr. Wilson to litigate in Utah would not be "so gravely difficult and inconvenient" that they would be at a "severe disadvantage." <u>Burger King</u>, 471 U.S. at 478. Accordingly, the court finds it has specific jurisdiction over Ms. Higgins and Dr. Wilson.

### IV. Motion for Jurisdictional Discovery and Motion to Strike

Because the court finds that it has personal jurisdiction over Dr. Wilson and Ms. Higgins, that Magellan is appropriately represented by Mr. Johnstun, and that the Curated Entities have

not excused the default entered against them, there is no need to grant Newpath jurisdictional discovery or strike any of the briefing.  The court therefore terminates these motions as moot.

### V. Notice of Appearance

On January 30, 2024, Magistrate Judge Daphne A. Oberg granted the Defendants' counsel leave to withdraw.  (ECF No. 83.)  Judge Oberg ordered Ms. Higgins and Dr. Wilson to file a notice of appearance—either a pro se appearance or appearance by new counsel—within 21 days of the date of her order.[11]  (Id. at 2.)  They have not filed any notices.

The court reminds Ms. Higgins and Dr. Wilson that they must file a notice of appearance or risk the entry of default judgment against them.  The court will allow these Defendants a final 21 days to file this notice but is not inclined to grant further extensions.

### ORDER

For the reasons stated above, the court ORDERS as follows:

1.      The Defendants' Motion to Set Aside Default (ECF No. 54) is GRANTED IN PART and DENIED IN PART.  The court sets aside the entry of default against Dr. Wilson but finds that the Curated Entities have not excused the entry of default against them.

2.      Ms. Higgins's Motion to Set Aside Magellan's Answer (ECF No. 57) is DENIED.  The court finds that Magellan is appropriately represented by Aaron Johnstun at this stage of the proceedings.

3.      The Defendants' Motion to Dismiss (ECF No. 55) is DENIED.  The court finds

---

[11] Judge Oberg also ordered Curated Funds and Magellan to file a notice of appearance within 21 days.  But because the court finds that the Curated Entities have not excused their default, and because the court further finds that Magellan is appropriately represented by Mr. Johnstun, these parties need not file a notice of appearance.

that the exercise of specific jurisdiction over Ms. Higgins and Dr. Wilson is appropriate.

4.     The court grants Ms. Higgins and Dr. Wilson 21 days from the date of this order to file a notice of pro se appearance or for new counsel to file a notice of appearance on their behalf.  Failure to file this notice may result in the entry of default judgment against these Defendants.

5.     The court grants Ms. Higgins 21 days from the date of this order to file a crossclaim against Magellan, asserting any claims about Magellan's appropriate ownership.

6.     In addition to sending a copy of this order to the Defendants' street addresses on file, the court directs the Clerk of Court to deliver a copy of this order to the following email addresses: jessica@cultured-group.com (Jessica Higgins) and drwilson@theremedyiv.com (Jarrod Wilson).[12]

DATED this 19th day of March, 2024.

BY THE COURT:

_Tena Campbell_

Tena Campbell
United States District Judge

---

[12] The court takes these email addresses from the Motion to Withdraw as Counsel filed by Ms. Higgins's and Dr. Wilson's previous counsel.  (ECF No. 82-1.)